IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN HYLER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN[1], | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | NO. 12-4974 |

# REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Kevin Hyler, brought this action under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). Presently before this court are the plaintiff's motion for summary judgment, the Commissioner's response, and plaintiff's reply to the Commissioner's response. For the reasons set for below, it is recommended that plaintiff's request for review be DENIED.

I.   FACTUAL AND PROCEDURAL HISTORY

On March 19, 2010, plaintiff protectively filed an application for DIB, alleging disability beginning November 1, 2003. (Tr. 125-26). The Social Security Administration denied plaintiff's claim on May 28, 2010 and plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 80-85). On February 15, 2011, ALJ William Reddy

---

[1]   Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for previous Commissioner Michael J. Astrue as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

held a hearing in Philadelphia. (Tr. 54). Plaintiff was represented by counsel during the hearing and plaintiff as well as a vocational expert, Gary A. Young, testified. (Tr. 54). Subsequently, on April 1, 2011, ALJ Reddy found that plaintiff was not under a disability, as defined by the Act, as of March 31, 2008,[2] the date last insured. (Tr. 40). Therefore, plaintiff was not entitled to DIB. On July 5, 2012, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff subsequently commenced this civil action.

II. LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988). "Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." See e.g., Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). Moreover, it is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, 402 U.S. 389, 401 (1971); Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). In determining whether substantial evidence exists, the reviewing court may not weigh the evidence or substitute its own conclusion for that of the ALJ. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). If the court determines the ALJ's factual findings are supported by substantial evidence, then the court must accept the findings as conclusive. Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir.

---

[2] Plaintiff alleges the date last insured was March 21, 2008 in his brief; however, March 31, 2008 is the date provided by the ALJ. Cf. Plaintiff's Brief 12/24/12 at 2; Tr. 40.

1984). It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Richardson, 402 U.S. at 401. While the Third Circuit has made it clear that the ALJ must analyze all relevant evidence in the record and provide an explanation for disregarding evidence, this requirement does not mandate the ALJ "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id.

To establish a disability under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57 (3d Cir. 1988) (quoting Kangas, 823 F.2d at 777); 42 U.S.C. § 423(d)(1) (1982). The claimant satisfies his burden by showing an inability to return to his past relevant work. Doak v. Heckler, 790 F.2d 26, 28; Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979) (citing Baker v. Gardner, 362 F.2d 864 (3d Cir. 1966)). Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy. 20 C.F.R. § 404.1520. See Rossi, 602 F.2d at 57.

As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step[3] process:

---

[3] The Third Circuit has clarified that this test is the same for determining whether a person is disabled for purposes of receiving both supplemental security income ("SSI") and DIB; therefore, the court will consider case law developed under both SSI and DIB law. Burns, 312 F.3d at 119 n.1.

>	(i) At the first step, we consider your work activity if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
>	(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
>	(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
>	(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
>	(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

III.	ADMINISTRATIVE LAW JUDGE'S DECISION

Using the above-mentioned five-step sequential evaluation process, ALJ Reddy determined that plaintiff had not been under a "disability" as defined by the Act, since March 31, 2008, the date last insured.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of November 1, 2003 to his date last insured of March 31, 2008. (Tr. 34). At step two, the ALJ found that plaintiff had the following severe impairments: depression; status-post bilateral hip replacements; bilateral knee disorder; cervical and lower back disorders; and carpal tunnel syndrome. (Tr. 34). In making this determination, the ALJ relied upon medical records of evidence, summarized as follows:

4

Plaintiff received all medical treatment, including physical examinations, therapy, diagnostic imaging, and surgery, at the Philadelphia Veterans Affairs Medical Center ("PA VAMC"). On March 3, 2003, diagnostic imaging of plaintiff's left knee showed "[m]oderate calcification deposition and osteoarthritic changes." (Tr. 248). In light of the radiology reports and physical examination, on April 24, 2003, plaintiff's orthopedist reported that plaintiff had chondrocalcinosis of the left knee. (Tr. 661). Further magnetic resonance imaging ("MRI") of plaintiff's left knee on May 27, 2003 showed an apparent "small focal tear of the posterior horn of the medial meniscus." (Tr. 247). On May 29, 2003, plaintiff sought physical therapy and reported that walking, sitting for long periods over one hour, climbing stairs, and bending caused him pain. (Tr. 658). Plaintiff ranked his pain as 5/10 for his knee and 5/10 for his hip. (Tr. 658). Plaintiff's reports of knee pain continued through October 7, 2003 when plaintiff sought treatment in the emergency room and was directed to wear an ace bandage for the apparent meniscal tear. (Tr. 653-55).

Plaintiff sought treatment for chest pain and shortness of breath on October 17, 2003. (Tr. 632). Diagnostic imaging showed no radiographic manifestation of acute tuberculosis. (Tr. 632). Additionally, around this time, plaintiff complained of hip pain. On November 12, 2003, diagnostic imaging of plaintiff's cervical spine revealed severe cervical spondylosis and imaging of plaintiff's lumbosacral spine showed severe lumbar spondylosis. (Tr. 631). Imaging of plaintiff's pelvis on the same day showed osteonecrosis of the femoral heads and severe degenerative disease of both hips. (Tr. 631). On May 21, 2004, further diagnostic imaging of plaintiff's hips and knees revealed bilateral degenerative joint disease (in the end stage on left), probable avascular necrosis, and chondrocalcinosis of the bilateral knees with minimal narrowing of the joint spaces. (Tr. 244-45). On July 21, 2004, plaintiff sought treatment in the

5

orthopedic department due to pain in his groin, pain with sitting, standing, and walking more than one block, and pain at night. (Tr. 636). Follow up examination of plaintiff's chest on December 17, 2004 revealed no active diseases. (Tr. 243). At that time, plaintiff reported he was able to walk two to three blocks without chest pain, but the pain in his hips prevented him from walking further. (Tr. 621). Plaintiff also experienced extertional dyspnea when walking up a flight of stairs carrying groceries. (Tr. 621).

Subsequent examinations and treatment of plaintiff's hips in 2005 revealed that plaintiff had severe degenerative joint disease in the left hip. (Tr. 197). At this time, plaintiff felt conservative measures for controlling his pain had been unsuccessful and elected to have surgery. (Tr. 197). On January 13, 2005, plaintiff underwent left hip replacement surgery. (Tr. 197). Plaintiff also took additional measures regarding his cardiac problems, and on January 18, 2005, plaintiff had cardiac catheterization. (Tr. 252). On January 24, 2005, plaintiff reported in a follow up appointment for his hip replacement that on a "bad day" he has trouble stepping into the bath tub, but he has increased his standing tolerance to over eleven (11) minutes. (Tr. 563). Plaintiff's physical therapist worked with him in activities of daily living ("ADL") retraining and functional transfer training, while also helping plaintiff increase standing tolerance and item retrieval. (Tr. 563). Plaintiff reported having difficulty performing shopping and carrying groceries up his apartment steps. (Tr. 563). Overall, his physical therapist reported that he was progressing well through treatment. (Tr. 564). Nonetheless, plaintiff missed numerous appointments between July 2005 and April 2006 for a variety of treatments, including appointments for his hepatitis, cardiac problems, and orthopedic follow ups. (Tr. 487).

Although plaintiff underwent a psychiatric evaluation during treatment in the Addiction Recovery Unit for being in early remission from cocaine and alcohol dependence in

6

May 2004, at that time plaintiff had a GAF score of 75[4] and there was no indication of depression. Plaintiff reported symptoms of depression for the first time on May 26, 2006. (Tr. 492). Plaintiff met the criteria for a "current depressive episode (minor depression or depression in remission)." (Tr. 493). Plaintiff did not meet the criteria for a current anxiety disorder and did not demonstrate psychotic or manic/hypomanic symptoms. (Tr. 493-94). At this time it was not recommended that plaintiff be referred to specialty care; rather, plaintiff was directed to be managed by primary care physician. (Tr. 492).

Plaintiff had a bilateral exam of his knees on May 9, 2006 and the impression was of "[m]oderate osteoarthritis in the knees bilaterally." (Tr. 234). On the same day plaintiff also had diagnostic imaging of both hips, revealing "severe osteoarthritis in the right hip with obliteration of the joint." (Tr. 235). On August 16, 2006, plaintiff had an ultrasound of his abdomen due to his Hepatitis C, which revealed a negative study. (Tr. 232-33). On October 3, 2006, plaintiff had an abnormal study of his heart showing "trace tricuspid regurgitation" and "small pericardial effusion circumferential to the heart which is not hemodynamically significant." (Tr. 207).

Plaintiff reported for an orthopedic follow up regarding his hips and knees on December 8, 2006. (Tr. 296). Upon physical exam, the physician noted there was no internal or external rotation of the right hip without pain and plaintiff experienced pain when pressure is

---

[4] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and doctors to "measure the psychological, social, and occupational functioning levels of an individual." Torres v. Barnhart, 139 F. App'x 411, 415 n.2 (3d Cir. 2005) (citations omitted). A GAF score of 80-71 indicates that if symptoms are present they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 32.

applied to the right hip and groin. (Tr. 475). On January 27, 2007, plaintiff returned to the orthopedic clinic with complaints of continued pain in his right hip. (Tr. 190). Plaintiff rated his pain at 8 out of 10 and had been treated by his primary care physician with Tramadol and Piroxicam, but the pain had worsened over time and he wanted to pursue surgical treatment. (Tr. 190). Upon examination, plaintiff had limited range of motion in his right hip (80 degrees of flexion and 0 extension) and no internal or external rotation. (Tr. 190). Treatment options were discussed, and because he had done well after he had a total left hip arthroplasty in 2005, plaintiff elected to pursue operative treatment on his right hip. (Tr. 190). On February 8, 2007, plaintiff underwent surgery on his right hip. (Tr. 190). After the surgery, plaintiff received follow up care by a physical therapist and occupational therapist to restore prior level of functioning ("PLOF"). (Tr. 391). At this time, plaintiff reported living alone in a second floor apartment and not working due to disability. (Tr. 388). Plaintiff reported his former girlfriend was assisting him with shopping. (Tr. 388). Plaintiff presented with minimal occupational performance deficits in ADLs and functional mobility with decreased endurance. (Tr. 388). The occupational therapist determined plaintiff would benefit from occupational therapy for ADL retraining, transfer training, energy conservation, and home management. (Tr. 388).

A bilateral study of plaintiff's hips on July 20, 2007 revealed "[b]ilateral hip arthroplasties with normal postoperative appearance." (Tr. 215). On the same day plaintiff also had a diagnostic study of his cervical spine, which revealed an impression of "[d]iffuse degenerative spondylitis." (Tr. 216). On August 22, 2007, plaintiff had an ultrasound of his abdomen as follow up for his Hepatitis C treatment and the study showed major abnormality. (Tr. 214). A follow up MRI of plaintiff's spine on January 24, 2008, showed a consistent finding of moderate multilevel cervical spondylosis that was most advanced at the C4-C5. (Tr. 213).

8

On December 27, 2007, plaintiff had a mental health evaluation after reporting feelings of depression when he became homeless three months earlier. (Tr. 315). Plaintiff complained that his sleep was disrupted due to his depression. (Tr. 315). At this time, plaintiff tried to stay active by working in the kitchen at the shelter and volunteering at a nursing home. (Tr. 315). However, plaintiff also stated that he was limited physically due to hip replacements. (Tr. 315). Plaintiff was referred for psychotherapy for depression and sought treatment in the Mental Health Unit on January 23, 2008. (Tr. 300, 306). The treating psychiatrist determined plaintiff did not have any suicidal ideations and no psychotic or manic symptoms, but plaintiff reported significant symptoms of depression. (Tr. 306). Plaintiff received counseling in the mental health clinic on February 14, 2008. (Tr. 303). Plaintiff's current GAF score was determined to be 55.[5] (Tr. 303, 300). Plaintiff reported being depressed, but stable, and encouraged to be moving out of the shelter in March. (Tr. 303). Plaintiff was tolerating the prescribed Prozac and Ambien without side effects although he had not yet noticed a change in mood. (Tr. 303). The psychiatrist prescribed Citalopram in addition to psychotherapy. (Tr. 304).

During psychotherapy, plaintiff reported a history of difficulty dealing with the deaths of his parents and twin brother in the 1980s. (Tr. 305). Plaintiff had a depressed mood and no support system in place, but no suicidal ideation. (Tr. 305-06). The psychiatrist diagnosed plaintiff with major depression. (Tr. 306). On February 15, 2008, plaintiff had a phone assessment with the behavioral health lab to monitor adherence to antidepressant treatment.

---

[5] A GAF score of 51-60 indicates moderate symptoms *or* moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 32.

(Tr. 301). Plaintiff was taking his antidepressant as prescribed and not experiencing any side effects. (Tr. 302). On March 11, 2008, plaintiff presented in "fair spirits" and stated he had improvement in his mood, having four good days out of seven. (Tr. 300). However, the shelter environment was crowded and noisy, which caused him stress and anger. (Tr. 300).

Additionally, the record contains the following medical findings that are after plaintiff's date last insured of March 31, 2008. On May 9, 2008, during a primary care physical exam, plaintiff complained of pain in his right foot due to "bunions with hyperpigmented mass over 1st MTP [i.e., metatarsophalangeal] joints (R>L)." (Tr. 298). On May 12, 2008, plaintiff had a bilateral examination of his right foot due to the pain complaints and the study showed bone spurs and severe osteoarthritis at the first and metatarsophalangeal joints. (Tr. 211). Plaintiff returned to his podiatrist on June 5, 2008 due to increased pain, including pain when wearing sneakers, and plaintiff reported that his pain had worsened in his feet after the hip replacements. (Tr. 289). X-rays were taken and plaintiff declined surgical treatment but was cast for custom orthotics. (Tr. 290). Plaintiff had a follow up with his podiatrist on November 20, 2008 and plaintiff reported that he liked the orthotics, he experienced more pain in his right foot than left due to the bump on his foot and he only had significant trouble when wearing dress shoes and was not interested in surgery or other measures at this time. (Tr. 270).

On June 3, 2008, plaintiff had a follow up visit with his neurologist for the pain down his left arm. (Tr. 290). The impression was that plaintiff likely had cervical radicular pain due to cervical spondylosis without myelopathy and may have carpal tunnel syndrome, but not a likely surgical candidate since there is no neurological deficit. (Tr. 291). On June 9, 2008, plaintiff had a neurological diagnostic study performed, which revealed an abnormal study. (Tr. 204). Plaintiff had an ultrasound of his abdomen due to his Hepatitis C on November 18, 2008,

which revealed "grossly unremarkable ultrasound of the abdomen" and the spleen was diminutive in size. (Tr. 210). On December 5, 2008, plaintiff had a one-year follow up examination after his hip arthroplasty. (Tr. 208). The impression included notations of bilateral total hip arthoplasties that had not significantly changed in position and "calcified loose bodies" about the right hip. (Tr. 208). A new "rounded lucent defect seen at the lateral bone-prosthesis interface in the right proximal femur" was detected and clinical correlation with a bone scan was recommended. (Tr. 208). On the same date plaintiff also had a follow up in the cardiology department and the treatment provider noted that plaintiff did not have chest pain but had some shortness of breath ("SOB") when he carried groceries or walked up stairs. (Tr. 267). Otherwise, plaintiff remained fairly active, walking eight to ten blocks twice a day without limitation or chest pain. (Tr. 267).

On January 22, 2009, plaintiff had a follow up with the neurology department for pain down his left arm. (Tr. 265). The physician noted that plaintiff appeared comfortable sitting, changing position and walking, although his gait was abnormal due to hip replacements. (Tr. 265). The physician further noted that he has cervical radicular pain due to cervical spondylosis without myelopathy, but not a surgical candidate because plaintiff had no neurological deficit so the physician referred plaintiff to physical therapy. (Tr. 265). On March 19, 2009, plaintiff's primary care annual evaluation included a depression screen and plaintiff received a score of a 0, which is a negative screen for depression. (Tr. 257). Plaintiff's "problem list" included his hip replacements, severe cervical spondylosis, bilateral carpal tunnel syndrome, bilateral knee pain, monitored by cardiologist and had stent placement on January 18, 2005, previous dependence on tobacco, alcohol, and cocaine, history of depression, and diagnoses of Hepatitis C and thrombocytopenia. (Tr. 250). Other health problems noted on August 31, 2009

11

in the progress notes included right foot bunion and that plaintiff was overweight and had been referred to the Management of Overweight/Obese Veterans Everywhere ("MOVE") program for weight loss. (Tr. 253-54, 256-57). Plaintiff's progress notes also indicated that plaintiff had "suboptimal compliance keeping clinical appointments." (Tr. 250, 252). In a follow up cardiology appointment on September 28, 2010, the cardiologist reported that plaintiff did not have any chest pain, shortness of breath, PND [paroxysmal nocturnal dyspnea], peripheral edema, or palpitations. (Tr. 749). Plaintiff reported lifting weights regularly with some soreness after but no chest pain during weight lifting or when walking. (Tr. 749). However, plaintiff stated he is unable to perform much aerobic activity due to hip pain. (Tr. 749).

On May 10, 2010, Jonathan Rightmyer, Ph.D., conducted a psychiatric review of plaintiff and determined plaintiff had affective disorder and substance addiction disorder as plaintiff was in remission from cocaine dependence. (Tr. 687, 695). Dr. Rightmyer determined plaintiff had mild limitation in restriction of activities of daily living, mild limitation in difficulties maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 697). Dr. Rightmyer did not find presence of the "C" criteria. (Tr. 698). Dr. Rightmyer concluded that "ADLs look adequate for simple routine tasks" and "VAMC shows intact MSE [mental status evaluation]." (Tr. 699). Dr. Rightmyer made the following mental residual functional capacity assessment: not significantly limited in understanding and memory, not significantly limited in sustained concentration and persistence except moderately limited in the ability to maintain attention and concentration for extended periods, not significantly limited in social interaction, and not significantly limited in adaptation. (Tr. 701).

Continuing with the five-step analysis, ALJ found at step three that plaintiff did not

have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 34). Specifically, criteria of Listing 1.02(A) for lower extremities were not met because the record did not show that plaintiff had the inability to ambulate effectively. (Tr. 34-35). The criteria for Listing 1.02(B) for upper extremities were not met because the record did not show that plaintiff had an inability to perform fine and gross movements effectively. (Tr. 35). The criteria of Listing 1.04 for disorders of the spine were not met because there was no evidence of nerve root compression, spinal arachnoidits or lumbar spinal stenosis with ineffective ambulation in the medical record. (Tr. 35). Lastly, plaintiff's mental impairments did not meet or medically equal the criteria of Listing 12.04 because the "paragraph B" criteria were not satisfied as there were not at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration and "paragraph C" criteria were not satisfied as there was no evidence of repeated episodes of decompensation since the alleged onset date to the date last insured and no evidence that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (Tr. 36). Therefore, the ALJ determined plaintiff was not disabled *per se* and continued to the next step of the analysis.

At step four, the ALJ found that plaintiff had the "residual functional capacity to perform light work as defined in 20 C.F.R. 404.1557(b) except: never to climb ladders, ropes or scaffolds or do any balancing; no more than occasionally climb stairs, bend, kneel, crouch and crawl; no more than frequent handling and fingering with the upper extremities; and limited to simple, routine tasks secondary to a moderate (limited, but still able to function satisfactorily) limitation in concentration, persistence, and pace." (Tr. 37). After reviewing opinion evidence and treatment records of plaintiff's hip, knees, back and depression, the ALJ determined plaintiff's

13

medically determined impairments could reasonably be expected to cause the alleged symptoms, but found plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms not to be credible to the extent the statements were inconsistent with the residual functional capacity assessment. (Tr. 37-38). The vocational expert testified that plaintiff's residual functional capacity precluded the performance of his past work as an assistant store manager, physical therapy aid, cleaner, and telemarketer. Accordingly, the ALJ concluded that plaintiff was unable to perform any past relevant work and proceeded to step five of the analysis.

At step five, the ALJ considered plaintiff's residual functional capacity, age, educational level, and work experience in terms of his ability to transfer to other work. (Tr. 39). On the date of last insured, plaintiff was fifty-three (53) years old, which is defined as an individual closely approaching advanced age, plaintiff had at least a high school education, and plaintiff was able to communicate in English. (Tr. 39). In light of plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that plaintiff was able to perform other jobs that existed in significant numbers in the national economy, including a cashier and office helper. (Tr. 39-40). Accordingly, the ALJ concluded that plaintiff was not disabled. (Tr. 40).

IV.     PLAINTIFF'S CONTENTIONS

Plaintiff alleges two claims: (1) the ALJ erred by failing to classify osteoarthritis of the feet as a severe impairment; and (2) the ALJ erred by failing to include a limitation of bilateral foot disorder in the hypothetical question posed to the vocational expert. (Plaintiff's Brief 12/24/12).

V.      DISCUSSION

The Commissioner's findings must be affirmed if they are supported by substantial

evidence. 42 U.S.C. § 405(g); Richardson , 402 U.S. at 401. The role of this court is to determine whether there is substantial evidence to support the Commissioner's decision. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993). In coming to a decision, it is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Richardson, 402 U.S. at 401.

After review of the records, this court finds the ALJ's decision was supported by substantial evidence. As such, plaintiff's request for review should be DENIED.

    A.    <u>Whether the ALJ Erred by Not Finding Osteoarthritis of the Feet was a Severe Impairment</u>

Plaintiff alleges that the ALJ erred by failing to find that plaintiff's osteoarthritis of the feet was a severe impairment. (Plaintiff's Brief 12/14/12 at 4). The Commissioner responds that the evidence relating to plaintiff's osteoarthritis of his foot does not relate to the period prior to the date last insured, and thus, is not relevant for purposes of determining eligibility for DIB. (Respondents' Brief 1/28/13 at 4). Furthermore, even if the evidence was relevant, the limitation was minimal and controlled by medication, thereby it did not constitute a severe impairment. (Respondents' Brief 1/28/13 at 5). In reply, plaintiff argues that evidence dated less than two months following the expiration of the date of last insured is relevant and probative to plaintiff's claim, and thus, should have been considered by the ALJ. (Plaintiff's Reply 2/7/13 at 1).

At step two of the five step analysis the plaintiff bears the burden of proving that an alleged impairment was severe during the relevant time period. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). An impairment is severe if it is "of magnitude sufficient to limit significantly the individual's ability to do basic work activities." Therefore, in the case at bar, the

15

plaintiff bears the burden of establishing that plaintiff's osteoarthritis of the feet was a severe impairment during the relevant time period.

Because this case is an application for DIB, the plaintiff must prove that the onset of his disability occurred while plaintiff was insured under 42 U.S.C. § 423(c). The relevant time period that the ALJ in this case must consider is whether plaintiff was disabled for DIB purposes at any time between plaintiff's alleged onset date of November 1, 2003 and the date plaintiff was last insured, March 31, 2008. See Ortega v. Comm'r of Soc. Sec., 232 Fed. Appx. 194, 197 (3d Cir. 2007) (finding the ALJ did not err by failing to credit alleged impairments because there was no evidence of the impairments in the record prior to the date last insured).[6] The date last insured is based on the number of sufficient quarters of coverage that a plaintiff acquires to remain insured under the Act. See Massaro v. Comm'r of Soc. Sec., 84 Fed. Appx. 175, 177 (3d Cir. 2003). Evidence related to plaintiff's condition after the date last insured is irrelevant. Ortega, 232 Fed. Appx. at 197. "Further, a medical condition which begins during a claimant's insured period, but does not become disabling until after its expiration, may not be the basis for qualification for disability benefits under the Act." Capoferri v. Harris, 501 F. Supp. 32, 36 (E.D. Pa. 1980), aff'd 649 F.2d 858 (3d Cir. 1981). While plaintiff did provide medical records for the ALJ that dated after the date last insured, the ALJ was only required to consider the medical records for the DIB

---

[6] Plaintiff focuses the reply brief on distinguishing this case from Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008), which is one case cited by the Commissioner to support the argument that evidence of plaintiff's foot pain are not relevant because such records are dated after plaintiff's date last insured. The law is well established beyond merely statements made in Johnson that evidence of impairment after the date last insured is not relevant. See e.g., 20 C.F.R. § 404.130; Ortega, 232 Fed. Appx. at 197; Massaro v. Comm'r of Soc. Sec., 84 Fed. Appx. 175, 177 (3d Cir. 2003); Capoferri v. Harris, 501 F. Supp. 32, 36 (E.D. Pa. 1980), aff'd 649 F.2d 858 (3d Cir. 1981). Therefore, this court finds plaintiff's argument implying that a "common sense" principle should be adopted to credit treatment records dated two months after the date last insured to be unavailing.

16

relevant period of time between November 1, 2003 and March 31, 2008. See id.

In the case at bar, there is no evidence of complaints of foot pain or diagnoses of osteoarthritis of the feet prior to March 31, 2008. Although plaintiff tries to relate the foot pain back to 2007[7] because plaintiff alleges the pain worsened after his hip replacement, the first medical evidence in the record of foot pain is not until May 9, 2008, which is after the relevant time period. (Tr. 298). Plaintiff reported pain due to a bunion on his right foot. (Tr. 298). Subsequent diagnostic imaging on May 12, 2008 revealed that plaintiff had severe osteoarthritis at the metatarsophalangeal joints. (Tr. 211). Because these medical records are dated after the date last insured, the ALJ was not permitted to consider the evidence in evaluating plaintiff's impairments. See 42 U.S.C. § 423(c). Therefore, this court finds that the ALJ did not err in not discussing plaintiff's osteoarthritis of the feet since plaintiff did not seek treatment for the condition until after March 31, 2008. Moreover, any attempts to relate back the condition prior to the date last insured are insufficient because merely noting that pain began earlier does not establish a disabling condition. See Ortega, 232 F. App'x at 197. Accordingly, plaintiff's claim should be denied.

    B. Whether the ALJ Erred by Not Including Bilateral Foot Disorder in Hypothetical Posed to Vocational Expert

Plaintiff argues that the ALJ did not discuss any evidence relating to osteoarthritis of his foot, which means the residual functional capacity assessment is based on an incomplete review of the record, and thus, not supported by substantial evidence. (Plaintiff's Brief 12/14/12 at 6). The Commissioner responds that plaintiff's argument regarding the failure of the residual functional capacity assessment to include consideration of the osteoarthritis is without merit since

---

[7] Plaintiff cites to the record at Tr. 289 to support this assertion; notably, this is a treatment record dated June 5, 2008, which is after the date last insured.

17

there was no evidence of osteoarthritis of the foot during the relevant time period, and thus, it was not necessary to include the limitation in the hypothetical posed to the vocational expert. (Respondents' Brief 1/28/13 at 5). As stated above, plaintiff argues in reply that the evidence is both relevant and probative to plaintiff's claim, and thus, should be considered even though after the date of last insured. (Plaintiff's Reply 2/7/13 at 1).

The Third Circuit has provided criteria for evaluating an ALJ's reliance on vocational expert testimony. In order for a vocational expert's answer to a hypothetical question to be considered substantial evidence, the question must reflect all of a claimant's impairments that are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question portrays the claimant's individual physical and mental impairments. Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, in eliciting testimony from a VE, the ALJ's hypothetical need not contain every impairment alleged by the claimant, but must only convey all of the claimant's credibly established limitations. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005). Where the record contains medically undisputed evidence of a specific impairment not included in the hypothetical, the expert's response is not considered substantial evidence. Podedworny, 745 F.2d at 218.

An ALJ is only required to include in a hypothetical to the vocational expert the impairments that have been established in the record. The ALJ is not required to include all limitations asserted by plaintiff. In the case at bar, there was no evidence in the medical records from the relevant time period of plaintiff complaining of or seeking treatment for pain in his feet. The ALJ was only required to include impairments that were established by the medical records

18

during the relevant time period, which ended with plaintiff's date last insured, March 31, 2008. Therefore, the ALJ did not err by not including a limitation of osteoarthritis of the feet in hypothetical posed to the vocational expert. Accordingly, plaintiff's claim should be denied.

Therefore, this court makes the following:

RECOMMENDATION

AND NOW, this **29th** day of June, 2013, it is RESPECTFULLY RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED.


BY THE COURT:


 /s/ LINDA K. CARACAPPA
LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE